**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

NATHAN HOOPES and          )
DEVON HOOPES,              )
                           )
Plaintiffs,                )
                           )      NO. 1:10-CV-365
vs.                        )
                           )
GULF STREAM COACH, INC.,   )
                           )
Defendant.                 )

## OPINION AND ORDER

This matter is before the Court on: (1) Defendant Gulf Stream Coach, Inc.'s Motion to Bar Plaintiffs' Purported Expert Bernie Garceau, filed by the defendant, Gulf Stream Coach, Inc., on August 7, 2015 (DE #92); and (2) Defendant Gulf Stream Coach, Inc.'s Motion to Bar Plaintiffs' Expert Tom Bailey, filed by the defendant, Gulf Stream Coach, Inc., on August 7, 2014 (DE #94). For the reasons set forth below, the motion to bar Bernie Garceau (DE #92) is **GRANTED IN PART AND DENIED IN PART** as set forth in the body of this order, and the motion to bar Tom Bailey (DE #94) is **DENIED**.

PROCEDURAL HISTORY

This case was originally brought by the plaintiffs, Nathan and Devon Hoopes, (collectively "Plaintiffs") against two defendants,

Gulf Stream Coach, Inc. ("Gulf Stream") and General RV Center, Inc. ("GRV"), based on problems they experienced with their recreational vehicle ("RV") including, but not limited to, an issue with the RV's slide-out room. GRV filed a Motion for Summary Judgment to Enforce Arbitration Clause on May 16, 2011. This Court denied GRV's motion to compel arbitration but granted GRV's motion seeking dismissal of the claims against it as set forth in Plaintiffs' amended complaint. Gulf Stream filed its own Motion for Summary Judgment on December 16, 2013, which was granted in part and denied in part on September 29, 2014. The motion was granted as to Plaintiffs' Ohio Lemon Law Act, Ohio Consumer Sales Practices Act, Indiana Lemon Law Act, state law negligence claims, and Plaintiffs' alternative prayer for relief on the basis of revocation and/or rescission of the contract. However, the motion was denied as to Plaintiffs' Indiana Deceptive Consumer Sales Act claim.

The matter was referred to Magistrate Judge Susan L. Collins for purposes of a settlement conference, and several attempts to settle the case were made in August of 2015 but were concluded without resolution. In preparation for trial, Gulf Stream filed the instant motions to bar the testimony of Plaintiffs' proposed expert witnesses. Plaintiffs filed their responses in opposition on October 12, 2015. On October 19, 2015, Gulf Stream filed its replies. On November 6, 2015, this Court held an evidentiary hearing at which Plaintiffs' challenged experts testified. At the

conclusion of the hearing, the Court took the instant motions under advisement.

**DISCUSSION**

Federal Rule of Evidence 702, which governs expert testimony, provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011). In addition, in *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court fashioned a two-prong test of admissibility for evidence based on the "scientific knowledge" mentioned in Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). To be admissible, evidence must be both reliable and relevant. *Id.* at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting the objective of court's gatekeeping requirement is to ensure reliability and relevancy of expert testimony).

Under the reliability prong, scientific evidence must be reliable in the sense that the expert's testimony must present

genuine scientific knowledge. *Daubert*, 509 U.S. at 592-93; *Deimer v. Cincinnati Sub-Zero Prods. Inc.*, 58 F.3d 341, 344 (7th Cir. 1995). Generally, the expert witness must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the witness's field. *Kumho*, 526 U.S. at 152. Specifically, a court may, but is not required to, consider a nonexclusive list of four factors in assessing reliability: (1) whether the expert's theories and techniques can be verified by the scientific method through testing; (2) whether the theories and techniques have been subjected to peer review and publication; (3) whether the theories and techniques have been evaluated for their potential rate of error; and (4) whether the theories and techniques have been generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

However, it is important to note that "the measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). As the Seventh Circuit pointed out in *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001), the Advisory Committee notes to Rule 702 note that "[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, 2000 advisory committee notes. "[T]he test of reliability is 'flexible,' and *Daubert's* list of specific factors

neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd.*, 526 U.S. at 141-42.

Under the relevance prong, the testimony must assist the trier of fact to understand the evidence in the sense that it is relevant to or "fits" the facts of the case. *Daubert*, 509 U.S. at 591; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In other words, the testimony must be such that the jury can apply it in a meaningful way to the facts at hand. This "fit" analysis essentially represents an inquiry similar to if not indistinguishable from the basic evidentiary inquiries into whether evidence is relevant and, if so, whether its probative value is nonetheless substantially outweighed by, among others, the danger of unfair prejudice and jury confusion. *See Daubert*, 509 U.S. at 595; *Ayers v. Robinson*, 887 F. Supp. 1049, 1058-59 (N.D. Ill. 1995).

In this case, as noted above, Gulf Stream has objected to the testimony of Bernie Garceau ("Mr. Garceau") and Tom Bailey ("Mr. Bailey"). The Court will address each objection in turn.

*Bernie Garceau*

Gulf Stream moves to bar the testimony of Mr. Garceau, arguing that he is "unqualified to render what are essentially engineering opinions" and that Court should exclude his "biased and unreliable report and testimony." Plaintiffs respond by arguing that Mr.

Garceau is uniquely qualified to testify as to the slide-out system failure in this case based on his experience and background, that his report is reliable, and that his alleged bias does not justify excluding his testimony.

As to Mr. Garceau's qualifications, Gulf Stream takes particular issue with the fact that Mr. Garceau has a Bachelor of Science in finance rather than engineering, and it argues that because he oversees the "business related aspects of BAL RV Products Group," he is not qualified as an expert regarding the failure of the RV's slide-out system. At the evidentiary hearing, Mr. Garceau testified that he is currently the Brand Manager for Norco Industries ("Norco")[1] and that he previously owned and operated a company called Shannon Industries ("Shannon"). (DE #120, pp. 7-8.) While at Shannon, Mr. Garceau manufactured mechanical devices that could be used as "crude" slide-out systems.[2] (*Id*. at 8.) He designed all of the products that Shannon had, and he has been involved in design work throughout his career. (*Id*. at 11.) He eventually left Shannon and has worked for Norco since 1994 or 1995. (*Id*. at 9.) At Norco, Mr. Garceau

_____

[1] Mr. Garceau later clarified that he is an Executive Vice President and Brand manager for BAL, which is the RV-related brand for Norco. (DE #120, p. 9.)

[2] Mr. Garceau described a slide-out as a "room that slides out of an RV or any other type of vehicle that increases the living space. So it's basically a –– It has one wall that's open that's towards the inside of the coach, and the mechanism will drive that room out, once the vehicle is parked in a location, to increase the living space." (DE #120, p. 8.)

is currently responsible for all manufacturing and engineering related services. (*Id.* at 9-10.)

With respect to the slide-out system at issue in this case, Mr. Garceau testified that a gentleman brought Norco a rough, unrefined idea for a slide-out in 1998 or 1999, which Mr. Garceau then took and developed into the current product. (*Id.* at 10.) Mr. Garceau explained that Norco "hold[s] the patents on it. We pay royalties to the original gentleman, but as far as the mechanical workings and how it actually goes together and the design of it, that was mine." (*Id.*) Mr. Garceau indicated that it was his "conception after I took it from the original inventor, and it was my design to turn it into the product that it is." (*Id.* at 11.) He noted that his name is on the patents. (*Id.*) Mr. Garceau further testified that he is involved in troubleshooting of problems with the slide-out systems. (*Id.* at 12.) He currently reviews warranty claims, and for several years he was the hands on warranty administrator. (*Id.*) In that role, Mr. Garceau has assessed the source of problems with various slide-out systems in the field, and he examined the specific RV at issue in this case. (*Id.* at 12-13.)

Mr. Garceau testified that, based on his design experience and testing of the slide-out system over the years, installation instructions were developed to ensure that all component parts were in the right spot, were employed correctly, and were tightened down

correctly. (*Id*. at 22.) He also indicated that he was responsible for supervising the testing of the slide-out system with regard to load capabilities and screw strength at Norco's test laboratory, and that he performed years of testing and years of field analysis throughout the country to "see how the slide-out is working and what happens with them." (*Id*. at 22-24.) Finally, Mr. Garceau stated that he has been to several locations to teach manufacturers how to install the slide-out. (*Id*. at 24.)

As noted by the Seventh Circuit, "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether the expert is qualified to render an opinion in a given area." *U.S. v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005). That is because, "[w]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Id*. Gulf Stream asks the Court to discard all of Mr. Garceau's opinions because he is not an engineer. In its reply brief, Gulf Stream cites to several cases in support of its argument that no individual other than an engineer may testify as to engineering issues. See *Rose v. Truck Ctr., Inc.*, 611 F.Supp.2d 745, 749-751 (N.D. Ohio 2009); *Smith v. Ford Motor Co.*, 215 F.3d 713, 716, 717, 719, 720 (7th Cir. 2000); *Peak v. Kubota Tractor Corp.*, 924 F.Supp.2d 822, 825, 827, 829

(E.D. Mich. 2013); *Fedelich v. Am. Airlines*, 724 F.Supp.2d 274, 279
(D. P.R. 2010); *U.S. v. 14.38 Acres of Land, More or Less Situated
in Leflore County, State of Miss.*, 80 F.3d 1074, 1079, 1079 n.4
(5th Cir. 1996). Yet, with the exception of *Rose*, none of the
cases cited by Gulf Stream held that an individual was *unqualified*
to testify because they lacked an engineering degree; rather, the
various courts determined that the individual in question was
qualified to testify, in part, based on their engineering degree.
In *Rose*, a case involving re-manufactured steering gear that
allegedly caused a truck's steering to fail, the court did conclude
that a former truck driver turned mechanic lacked the expertise to
testify as to the product defect and causation issue because he was
not an engineer. *Rose*, 611 F.Supp.2d at 747, 749-50. However, in
so doing the court noted that the mechanic's proffered opinions
went "far beyond his expertise in the field of maintenance," and it
specifically pointed out that he had "never designed or
manufactured a steering gear for a truck." *Id*. at 750. *Rose* is
distinguishable from the case at bar because here we have an
individual who manufactured, tested, and designed the particular
slide-out system involved.

In a case cited by neither party that centered around the
alleged performance problems of a large, complex piece of
industrial machinery, the defendants moved to bar the report and
testimony of the plaintiff's expert, arguing that a "'user' of a

machine-who has no college degree or a degree in mechanical, electrical, or design engineering-is not thereby qualified to give expert opinion on design related matters." *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 372 F.Supp.2d 1104, 1112 (N.D. Ill. 2005). The court reviewed the qualifications of the plaintiff's expert which included working as a junior tool engineer, machine designer, and developer before starting his own company that manufactured precision blanking and slitting lines. *Id*. at 1111-12. When the company was bought out by a larger machine tool manufacturer, he because Vice President and General Manager of that company before eventually starting a consulting firm. *Id*. at 1112. In recognizing the expert's extensive involvement over fifty years with companies that manufactured the same type of machine at issue in the litigation, the court noted that "[n]othing in the text, purpose, or history of Rule 702 supports the notion that formal education or training is an indispensable prerequisite to a finding of testimonial competency. Indeed, the uncompromisingly plain language of the Rule refutes it." *Id*. at 1113. The court held that an individual who, like the plaintiff's expert, had "spent a protracted period running a company that manufactures the kind of machine involved in this case, has sufficient specialized knowledge gained through that experience that he can be qualified as an expert on all manner of things relating to the machinery." *Id*. (citing generally 29 Wright and Gold, Federal Practice and

Procedure § 6265 (1997)).  As to the defendant's argument that the expert's experience of running a company that manufactured precision blanking lines did "not prove that he *personally* engineered or designed the lines [at issue]," the court held that the lack of specialization or particular degree went to the testimony's weight and credibility, not its admissibility.  *Id.* (emphasis in original).

This Court finds the reasoning in *Loeffel Steel* persuasive and on point.  It is not disputed that engineers have been repeatedly deemed qualified to opine as to mechanical engineering issues.  That said, it does not necessarily follow that all non-engineers should be automatically excluded from testifying regarding such matters in every situation.  Gulf Stream has not pointed to, nor has the Court discovered, any Seventh Circuit cases that create such a bright line rule.  Rather, the Court is directed to consider the expert's "full range" of practical experience and training.  *Smith*, 215 F.3d at 718.  Gulf Stream's myopic approach would ask this Court to ignore the breadth of Mr. Garceau's credentials.  While it is true that he is not a licensed engineer and has no degree in engineering, Mr. Garceau has testified that he has designed, manufactured, and tested slide-out related systems for over twenty years, including designing (and patenting) the specific slide-out mechanism at issue.  As the designer of that mechanism, with years of experience in evaluating and testing the real-world

and laboratory functionality of the slide-out system in general as well as examining the subject RV's slide-out itself, he is uniquely qualified by knowledge, training, and experience to opine as to the slide-out system failure in this case despite his lack of a formal engineering degree.

Gulf Stream next argues that Mr. Garceau's "extreme bias" bars his report and testimony. While it is true that Norco was named as a defendant in this case but was later voluntarily dismissed by Plaintiffs (see DE #101), questions of potential bias are best left to vigorous cross-examination rather than exclusion. See *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52 (1987) ("[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable."); *U.S. v. Sasson*, 62 F.3d 874, 882-83 (7th Cir. 1995) (cross-examination is the proper tool to expose a witness's motivation in testifying). Indeed, the Seventh Circuit has clarified that expert witnesses need not be "disinterested" to give opinions on the matters involved in the suit because a jury is capable of discounting the weight of testimony from a source of perceived or actual bias. *Braun v. Lorillard Inc.*, 84 F.3d 230, 237-38 (7th Cir. 1996) ("A litigant, or a litigant's CEO, or sole stockholder, or mother, or daughter is not, by reason of his or her or its relation to the litigant, disqualified as an expert witness."); *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988)

(fining no impropriety even where the plaintiff testified as his own expert witness). Gulf Stream's request to bar Mr. Garceau's testimony on the basis of "extreme bias" is without merit.

Finally, Gulf Stream argues that Mr. Garcaeu's opinions are unreliable. Specifically, Gulf Stream takes issue with the following statements:

> (1) Broken or frayed cables are always an indication of improper installation or that there is a design flaw from the coach manufacturer, but a broken or frayed cable is not an indication of any design flaw or fault in the Norco-supplied parts.
>
> (2) [I]t is my opinion within a reasonable degree of certainty that the malfunctions of the slideout room experienced in the subject RV are the result of improperly installed standoff brackets, improperly adjusted cables, or potentially, an improperly constructed slide our box by the coach manufacturer, and not the fault of any of the parts or design of the Accu-Slide system itself.

(DE #93-2, pp. 2, 4.) Plaintiff responds by arguing that Mr. Garceau's experience in the design, manufacture, and troubleshooting of slide-out systems lends reliability to his opinions, especially in light of the fact that, according to Plaintiffs' unchallenged engineer expert, the slide-out system is straight-forward and "kinematically simple." (See DE #111-2, p. 1.)

In his report, Mr. Garceau states that he is familiar with and participated in the design, manufacture, and servicing of the type of slide-out at issue in this case. (DE #93-2, p. 1.) At the

-13-

evidentiary hearing, he greatly expanded upon that statement as was described by the Court above. The report notes that he conducted an inspection of the subject RV as well as a review of the Norco records relating to the slide-out. (*Id.*) Mr. Garceau's report details the inspection he performed and sets forth his observations related to the condition and installation of the slide-out. (*Id.* at 2-4.) Those observations include descriptions of the standoff brackets and their position, the condition of the adjustment brackets which attach the cables from the slide-out room to the chains from the motor, the lack of anti-vibration blocks, loose jam nuts on three of the adjustment brackets, a loose cable as a result of the improperly adjusted jam nut, scrape marks on the adjustment brackets as they struck one another during the operation of the slide-out room, a replacement cable that was installed with a u-bolt style cable clamp instead of the ferrule provided by Norco, scrape marks on the u-bolt and the adjustment bracket that came in contact with the u-bolt as the room was extended and retracted, standoff brackets that had been replaced, and screws that appeared to be at a maximum #8 as opposed to the recommend #10 or #12 screws. (*Id.*) The report ties the observations to details in the installation manual and to general properties of the system's functionality and operational capabilities. (*Id.*) When asked about his report during the evidentiary hearing, Mr. Garceau testified that he based his conclusions on observation, experience,

and testing. For example, Mr. Garceau indicated that he was familiar with the load capacities of the cable assembly which led to his opinion on broken or frayed cables (*Id*. at 17-19), that he visually observed the screws on the subject RV in relation to his experience with the recommended screw size that Norco had tested in its laboratory for years (*Id*. at 20-23), and that he relied on years of testing and years of field analysis "to see how the slide-out is working and what happens with them" to form his conclusion as to the particular slide-out of the subject RV (*Id*. at 23-24).

The Court agrees with Plaintiffs that this is a case where the relevant reliability concerns must be focused on the expert's knowledge and personal experience rather than a rigid application of the *Daubert* factors. Here, as noted above, Mr. Garceau tied his observations to the installation manual and/or general properties of the system's functionality and operational capabilities, and he pointed out specific variances or problems in the subject RV's slide-out. His opinions were not based on intuition, speculation, or conjecture as Gulf Stream argues but rather on his own observations, knowledge, and experience. "Personal observation is deemed often to be the most reliable source of information. Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called general truths derived from . . . specialized experience." *Loeffel Steel*, 372 F.Supp.2d at 1116 (internal quotation marks and citations omitted).

Furthermore, Mr. Garceau's report adequately sets forth his methodology (i.e. a description of each of the items he observed and deemed relevant to the slide-out's failure along with an explanation of any noted discrepancies from the usual standard) before reaching his conclusions as to the subject RV. The cases cited by Gulf Stream are simply inapposite because none involve reliability concerns that focus on personal knowledge and practical experience of the type at issue here. See *Loeffel Steel*, 372 F.Supp.2d at 1116-17 (distinguishing the case before it where expert had personal knowledge and practical experience of the subject matter from those cases where experts relied mainly on general field knowledge).[3] As in *Loeffel Steel*, the Court finds that Mr. Garceau's detailed physical and visual inspections of a system that he personally designed and manufactured, coupled with years of experience testing and observing the workings of such

_____

[3] Gulf Stream also argues that, because Mr. Garceau was advised by Gulf Stream in connection with the inspection that "the driver's side slide-out had experienced a broken cable and one of the standoff brackets had been pulled out of the wall to which they were attached," (*Id*. at 2), he had a "preconceived theory" as to the cause of the slide-out failure, which led to bias and unreliability in his conclusions. In the case relied upon by Gulf Stream to support that position, the district court held that the expert had developed a preconceived theory and thus lacked the objectivity to produce reliable scientific results. *Viterbo v. Dow Chem. Co.*, 646 F. Supp. 1420, 1424-25 (E.D. Tex. 1986). The court based that determination on the fact that the expert's data was "unreliable and lacking in probative force" because he had no past experience with the issue, could not find scientific literature to support his position, and performed tests which failed to establish a causal link to support his theory. *Id*. Here, there is no indication that Gulf Stream's disclosure, which was verified by Mr. Garceau upon his own detailed visual inspection, led to any such preconceived theory; Mr. Garceau has years of experience designing and testing slide-out systems and performed an inspection of the specific slide-out in question. That Gulf Stream reported facts regarding the slide-out's history to Mr. Garceau prior to his own inspection does not render his own conclusions inadmissible.

system in general, are sufficient to qualify his opinions as reliable regarding the malfunction of the slide-out system in the subject RV.[4]

That said, Mr. Garceau's opinion that broken or frayed cables are "always" an indication of improper installation and never a fault of the Norco supplied parts goes beyond the scope of this particular report and will be excluded.[5] Mr. Garceau's report lacks sufficiently detailed information, analysis, or data that would deem such a far reaching and broad conclusion reliable. Although Mr. Garceau's knowledge and practical experience serve to provide an adequate foundation for expounding upon the subject RV that he personally inspected and described in detail in the report itself, the Court cannot reasonably assess the reliability of Mr. Garceau's statements regarding cable failures in general without some reference to additional broad based methodology, which is simply not present. Mr. Garceau may, however, testify as to his own personal knowledge, experience, and testing as related to cable failures (as he did at the evidentiary hearing (see DE #120, pp.

_____

[4] [I]t is my opinion within a reasonable degree of certainty that the malfunctions of the slideout room experienced in the subject RV are the result of improperly installed standoff brackets, improperly adjusted cables, or potentially, an improperly constructed slide our box by the coach manufacturer, and not the fault of any of the parts or design of the Accu-Slide system itself.  (DE #93-2, p. 4.)

[5] "Broken or frayed cables are always an indication of improper installation or that there is a design flaw from the coach manufacturer, but a broken or frayed cable is not an indication of any design flaw or fault in the Norco-supplied parts."  (DE #93-2, p. 2.)

-17-

18-19)) without taking the extra step of tying those personal observations to a definitive conclusion regarding all cable failures in every situation.

*Tom Bailey*

Gulf Stream moves to bar the testimony of Mr. Bailey, arguing that it is both unreliable and irrelevant. As to relevancy, Gulf Stream argues that the "appraisal lacks consideration of the alleged problems at issue in the litigation" because Mr. Bailey's report deemed defects other than the driver's side slide-out irrelevant for purposes of valuation.[6] According to Gulf Stream, the slide-out failure is not at issue in this litigation because, "[a]lthough Gulf Stream is the manufacturer of the finished RV product, it did not manufacture the component part slide-out." Thus, Gulf Stream concludes, the slide-out is not covered by the Gulf Stream Coach, Inc. Limited Warranty (DE #95-2) (the "Warranty"), and Mr. Bailey's opinions will not assist the trier of fact "as they wholly address complaints not at issue in this litigation and ignore the quibbles that are at issue." Plaintiffs respond by pointing out that damages are clearly at issue in the case at bar, and they assert that the Warranty does indeed cover

---

[6] When asked about why he deemed the other defects irrelevant for purposes of the appraisal, Mr. Bailey testified at the evidentiary hearing that, "[t]he Gulf Stream Coach had such minor defects in other areas, that I didn't feel -- or didn't believe that those would be relevant in the overall picture of this slide-out failure." (DE #120, p. 56.)

the slide-out, making Mr. Bailey's testimony relevant to the subject RV's valuation.

The Court notes that Gulf Stream could have (and procedurally should have) raised this argument at the summary judgment stage if it believed the Warranty excluded all consideration of the slideout feature, yet it failed to do so. A *Daubert* motion is not the proper medium to raise dispositive contractual disputes, and the Court refuses to engage in a lengthy analysis of the issue at this time. That said, for purposes of this motion, the Court agrees with Plaintiffs that the Warranty does not automatically preclude Mr. Bailey's testimony. The Warranty provides a "one (1) year warranty under normal use against defects in Gulf Stream materials and/or workmanship in the construction of the recreational vehicle." (DE #95-2, p. 1.) The Warranty does not cover, however, "[a]ppliances and component parts not manufactured by Gulf Stream, including, but not limited to, auxiliary generator power plants, refrigerators, air conditioners, water heaters, furnaces, invertors, etc." or "[a]ny component part which possesses its own warranty from a party other than Gulf Stream." (*Id.* at 2.) Although the list of appliances and component parts exempted from coverage is nonexhaustive, the slide-out is not of the same type and kind as those that are listed. A slide-out is distinctly different than a water heater, a refrigerator, or a furnace in that the slide-out is part of the construction of the overall vehicle

that Gulf Stream delivered to Plaintiffs (i.e. the bolts, brackets, screws, etc.), while the component parts listed in the Warranty are stand alone items. Furthermore, Gulf Stream has presented no evidence that the slide-out is covered by its own warranty from any other party. See e.g. *Pack v. Damon Corp.*, 434 F.3d 810, 815-16 (6th Cir. 2006) (finding a rear monitor in an RV was appropriately excluded from the RV manufacturer's warranty because it was covered by its own separate warranty and was the same kind of item as those specifically listed as not covered; but distinguishing the RV's slide-outs that the plaintiff alleged did not close properly, noting that the manufacturer had attempted to fix the "loose slide-out gasket" and finding that the slide-outs did not fall under any exception to the manufacturer's warranty).

Even assuming, *arguendo*, that the slide-out mechanism could be considered a "component part not manufactured by Gulf Stream," the slide-out issue is greater than the mechanism alone. During the evidentiary hearing, Mr. Garceau testified that the slide-out mechanism manufactured by Norco did not include the rough opening in the RV or the room itself; rather the slide-out mechanism is "simply the drive for the room that's provided by somebody else," and it was delivered to Gulf Stream in an unassembled state. (DE #120, pp. 14-15.) Gulf Stream has not disputed Plaintiffs' assertion that Gulf Stream bought some of the parts that were used in the construction of the slide-out portion of the RV, nor has

Gulf Stream disputed that Gulf Stream employees were the ones to use their workmanship and skill to assemble the slide-out feature as a whole. Plaintiffs appear to allege that Gulf Stream "materials and/or workmanship" is at the heart of the problem with the slide-out, rather than the slide-out mechanism itself. For his part, Mr. Bailey testified at the evidentiary hearing that it would take approximately four-hundred hours to fix the slide-out room in a manner that would work successfully, which would entail replacing the slide-out system and modifying the structure including the hydraulics. (DE #120, pp. 72-73.) Based on the foregoing, the Court finds Gulf Stream's "materials and/or workmanship in the construction of the [RV]" remains at issue with regard to the slide-out and is not excluded by the Warranty; thus, Mr. Bailey's valuation report is relevant to the issue at hand.

Next, Gulf Stream argues that Mr. Bailey's report is unreliable because it lacks methodology as related to his valuation opinions. Gulf Stream does not take particular issue with Mr. Bailey's credentials or experience; rather, they assert that "[h]e has failed to demonstrate in this particular litigation that he has reliably applied specific, relevant factors through reliable principles and methods to reach conclusions that will assist the jury." Gulf Stream argues that Mr. Bailey's failure to explicitly specify what factors he considered in making his valuations prevents his testimony from being admitted. Plaintiffs respond by

arguing that Mr. Bailey's methodology is scattered throughout his report and that his "studies and certifications, coupled with his extensive experience, are more than sufficient to provide the foundation to qualify Mr. Bailey as an expert in RV appraisal values."

During the evidentiary hearing, Mr. Bailey testified that he conducts certified appraisals for the RV industry and other industries, along with investigations of RVs for possible damage. (DE #120, p. 37.) He described his background of purchasing vehicles at auto auctions and then repairing and/or modifying them before reselling the vehicles for his family's business. (*Id.* at 37-40.) He also indicated that he had experience constructing "toy hauler" RVs from scratch, essentially converting horse trailers to vehicles that included total living quarters, and he testified that he has repaired numerous damaged RVs. (*Id.* at 63-65.) According to Mr. Bailey, he has appraised in excess of 2,000 RVs over the past forty years, including appraisals for a number of RV manufacturers, RV dealers, retailers, government agencies, non-profit organizations, trucking companies, and law firms. (*Id.* at 41-42; see also DE #95-1, pp. 23-24.) Mr. Bailey also indicated that he took a course at the University of Michigan in RV appraisal techniques and that he received a certification from the RV Appraisal Institute of America. (*Id.* at 46-47.) In light of these facts along with Gulf Stream's failure to identify any particular

issue with Mr. Bailey's qualifications, the Court does not question that Mr. Bailey possesses the credentials necessary to testify as an expert witness as to the value of the RV.

With regard to the methodology employed by Mr. Bailey, when asked what tasks he performed and considered in completing his report and reaching his conclusions in this case, Mr. Bailey testified that he reviewed the service records of the subject RV, conducted a physical inspection, photographed the subject RV and documented any issues, reviewed the report of Jon S. Gerhardt, Ph.D, P.E. (the mechanical engineer and professor of mechanical engineering who also prepared a report in this case (see DE #95-1, pp. 27-28)), reviewed the RV Purchase Agreement dated January 23, 2010, reviewed Gulf Stream's Manufacturer Suggested Retail Price ("MSRP") for the RV, reviewed the Gulf Stream invoice for the subject RV, reviewed the Retail Installment Contract for the sale of the RV to Plaintiffs, reviewed Gulf Stream's description and floor plan of the RV, and reviewed the Accu-Slide Designer's Guide, Installation Manual, and Service Manual for the slide-out mechanism installed in the RV. (DE #120, pp. 53-55.) Mr. Bailey explained that his methodology, which has remained consistent since the 1960s or 1970s, also included looking at the condition of the RV and its mileage, the geographical location in question, the time of year the sale was contemplated, the financing rates, supply and demand issues, fuel prices, repair costs, and the desirability of the

options of the RV in question.  (*Id.* at 50, 59-67.)  As to the
repair costs, Mr. Bailey testified that:

> A. I considered what it would entail for me to
> take that RV and figure out a means to fix the
> slide-out in a manner that would work
> successfully.  And in doing so, I considered
> the hours and the materials.
> Q. And do you have experience with both of
> those in your work for the RV dealers?
> A. Yes, I've done this --
> Q. As well as manufacturers?
> A. -- many years in the past.
> Q. Okay. Go ahead.
> A. The hours -- Well, first of all, I had to
> consider what type of slide-out system would
> work in that successfully, and I decided on
> HWH system.
> Q. There are different slide-out systems out
> there, aren't there?
> A. Yes. And this is a very good one.
> Q. Go ahead.
> A. I also considered what modifications would
> have to be made to implement that. And in
> doing so, because there's changes in
> structure, there's changes underneath in order
> for the hydraulics, and I came to the
> conclusion that approximately 400 hours would
> be required.
> Q. From beginning to end?
> A. I'm sorry.
> Q. From the beginning to the end of that
> repairing process?
> A. Yes.
> Q. Go ahead.
> A. 400 hours at about a hundred dollars an
> hour is approximately $40,000.
> Q. How do you know a hundred dollars an hour
> is accurate in the industry?
> A. I've done -- I travel all throughout the
> United States on RV cases and met RV dealers,
> and I see the rates posted.  I know what they
> are on the estimates.
> Q. All right.  So your experiences taught you
> that?
> A. Yes. That's --
> Q. Okay.  What do you do next -- Or what did

you do next?

A. I considered the parts, approximately about six to seven thousand dollars.

Q. And how do you know that to be accurate?

A. From past experience.

Q. Okay. And next what did you do?

A. I added the two together and come up with approximately about $47,000. And I subtracted that from the purchase price and came up with a figure of $60,000. And I also included a profit.

Q. Okay. So the pieces of it are the repair cost and the profit and the resulting number; correct?

A. Yes.

Q. All right. Now, can you tell the Court how the specifics of your experience over the years contributed or led to your valuation conclusions in this case.

A. Well, the specifics, my past knowledge and experience of the modifications that I've done over the years.

Q. Have you also seen defects and damages in RV sales as they occurred?

A. Yes. And I've learned over the years that, when there's an inherent problem or damage, it greatly affects the value.

(*Id.* at 72-74.) Mr. Bailey indicated that, in an attempt to verify his conclusions with regard to the value of the subject RV, he contacted numerous RV dealers, disclosed the condition of the slide-out and failed repair history, and asked them what they would be willing to purchase the subject RV for. (*Id.* at 75-76.) According to Mr. Bailey, none of the dealers were interested in buying the subject RV under any circumstances. (*Id.*)

With the exception of specific repair costs for the slide-out, Mr. Bailey's report incorporates and/or references the aforementioned testimony either directly or indirectly as having

been considered in estimating the cost of the RV. (See DE #95-1, pp. 3-7, 10-14, 19-21.) The report also delineates generally accepted definitions for determining fair market value according to tax law,[7] lists three areas of fair market value determination,[8] and references the National Automobile Dealer Association ("NADA") guide book as the generally accepted industry standard for guideline valuations. (*Id*. at 7-8, 12-13.)

As to Mr. Bailey's valuations, he offered methodology details related to each of the three areas of fair market value conclusions in his report. For the fair market value on the date of delivery if the subject RV was as represented and purchased under normal retail sales conditions ($180,000), Mr. Bailey's report indicates that he considered the MSRP of $195,153.80 and then reduced that cost to a range of between $180,000.00 and $185,000.00 because "[d]ealer's traditionally will sell a product for a little less than retail." (*Id*. at 19.) In determining this range and final conclusion, he considered the "time of year, location, demand of product, etc." and utilized his "past multiple dealership

---

[7] The report states that "[f]air market value (FMV) is the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts." (DE #95-1, p. 7.)

[8] The three separate areas are listed as: (1) the fair market value as if the RV was offered and purchased under normal retail sales conditions; (2) the fair market value as if the RV was offered and purchased in the open market under discounted or sales conditions, and (3) the fair market value as if the RV was offered and purchased in the open market after considering the known product defects. (DE #95-1, pp. 12-13.)

ownerships experience and dealer interaction over the years." (*Id.*) For the fair market value on the date of delivery under discounted or sales conditions ($127,420.33), Mr. Bailey's report indicates that he considered the purchase price of $127,420.33 shown on the purchase agreement (not including the taxes, fees, and add-ons) and determined it was a "good purchase value" because it was several thousand dollars less than the wholesale dealer price of the RV. (*Id.* at 20.) Finally, for the fair market value of the subject RV in its condition on the date of delivery ($60,000), Mr. Bailey's report indicates that he considered the product defect (i.e. the malfunctioning slide-out room) in light of the fact that there had been numerous unsuccessful attempts to fix it along with the resultant uncertainty on a prospective purchaser who "would have to accept the fact they must repair the issue at hand not truly knowing what may be entailed." (*Id.*) Mr. Bailey also noted that he contacted eight (8) RV and Marine dealers in Ohio "to verify if any would accept a trade-in or outright purchase knowing [of] the slide-out issue," and each one communicated that they were not interested in the subject RV in any manner. (*Id.* at 20-21.)

Based on the foregoing, the Court agrees with Plaintiffs that, in this case, the methodology scattered throughout Mr. Bailey's report coupled with his undisputed experience in the RV appraisal industry is sufficiently reliable to allow him to testify as to the RV's valuation. Mr. Bailey's approach may not have been

"scientific," but it was specialized as well as technical, which is allowable under Rule 702. See *Lees v. Carthage Coll.*, 714 F.3d 516, 524-25 (7th Cir. 2013) ("Rule 702, . . . does not condition admissibility on the state of the published literature, or a complete and flaw-free set of data.") As noted recently by a district court within this circuit when addressing an insurance field adjuster's challenged methodology:

> The Seventh Circuit has cautioned that the test for reliability for nonscientific experts is flexible. Unlike scientific or technical experts, whose hypotheses can be tested or subjected to peer review and whose methods can be measured against specific industry standards, an insurance adjuster and appraiser[] cannot be so mechanically scrutinized. [The field adjuster's] opinions rely on his experience, and expert testimony is not unreliable simply because it is founded on [a witness's] experience rather than on data; indeed, Rule 702 allows a witness to be qualified as an expert by knowledge, skill, experience, training, or education.

*Church v. Church Mut. Ins. Co.*, 13 C 1625, 2016 WL 772787, at *4 (N.D. Ill. Feb. 29, 2016) (internal quotation marks and citations omitted). Mr. Bailey's report indicates that he relied on accepted industry standards (i.e. consulting the NADA guide) and considered a variety of relevant, recognized factors as described above in forming his conclusions. See *Pizel v. Monaco Coach Corp.*, 374 F. Supp. 2d 653, 656-57 (N.D. Ind. 2005) (district court allowed challenged appraiser's expert testimony because he "made a valuation based upon his experience in the industry, and consulted

various recognized and approved valuation guides" before assigning a value to the RV in question).  Importantly, Mr. Bailey's report repeatedly emphasizes the role his experience as a multiple, full-line RV dealership owner with extensive service and sales experience played in determining the various valuations.  Gulf Steam complains of a lack of specificity in Mr. Bailey's report, but Court finds that appraisals are not an exact science that can be mechanically scrutinized; rather, as long as an explanation of the methodologies and principles supporting the experienced appraisers opinion were referenced and the conclusions were not based on subjective belief or speculation alone, the report passes muster.  See *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).  Here, for the reasons set forth above, Mr. Bailey's report meets those standards.

To the extent that Gulf Stream takes issue with Mr. Bailey's lack of specificity as to the valuation of the subject RV in its (allegedly defective) condition, the Court notes that Mr. Bailey's report places great emphasis on the unknown repairability aspect of the slide-out and its resultant impact on a potential purchaser. The report indicates that, to determine the value of a vehicle with such defect and safety issues, the appraiser must utilize his own experience and background in making the final determination.  The Court finds this methodology acceptable as it acknowledges the significance of the "human behavior" factor referenced earlier in

the report, which is not capable of precise quantification.[9] The

report points out that the greatly reduced valuation was validated

when all eight RV dealerships confirmed that they were not

interested in the subject RV under any circumstances. Furthermore,

during the evidentiary hearing, Mr. Bailey expanded upon his

methodology with regard to estimated repair costs, testifying that

his experience and background in the RV industry coupled with his

hands on experience related to RV repairs and modifications

directly led to the valuation reached.[10] Mr. Bailey's report and

testimony are deemed reliable. While Gulf Stream may disagree with

Mr. Bailey's conclusions, this does not prevent his expert opinions

from being presented to the jury. See *Lapsley v. Xtek, Inc.*, 689

F.3d 802, 805 (7th Cir. 2012) ("A *Daubert* inquiry is not designed

to have the district judge take the place of the jury to decide

ultimate issues of credibility and accuracy. If the proposed

---

[9] The report indicates that "[t]he value of a Recreational Vehicle is either created, maintained, modified, or destroyed by the forces that motivate human behavior. These forces may vary due to governmental regulations, natural forces, owner neglect, accidental damage, failure of a dealer or manufacturer to correct normally working items, or obsolescence of a Recreational Vehicle part. Each force, individually or combined, can have an adverse effect on value." (DE #95-1, p. 8.)

[10] While the details of the estimated repair costs were not discussed in Mr. Bailey's report, the importance of the potential repair was acknowledged and cited as a relevant factor. Mr. Bailey's testimony provided additional details and put Gulf Stream on notice as to the specifics of his anticipated testimony. See *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) ("The purpose of these [expert] reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary. They allow attorneys, not experts in the fields at issue, to prepare intelligently for trial and to solicit the views of other experts.")

expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.") (internal quotation marks and citation omitted). Thus, Gulf Stream's motion is denied.


<u>CONCLUSION</u>

For the reasons set forth above, the motion to bar Bernie Garceau (DE #92) is **GRANTED IN PART AND DENIED IN PART** as set forth in the body of this order, and the motion to bar Tom Bailey (DE #94) is **DENIED**.

**DATED: March 25, 2016**          <u>**/s/RUDY LOZANO, Judge**</u>
                                   **United States District Court**